**Christopher AMANN, et al., Plaintiffs, Appellants,**

v.

**STOW SCHOOL SYSTEM, et al., Defendants, Appellees.**

**No. 92–1382.**

United States Court of Appeals, First Circuit.

Submitted July 17, 1992.

Decided Dec. 29, 1992.

---

Richard Amann on brief pro se.

Scott Harshbarger, Atty. Gen., and Pierce O. Cray, Asst. Atty. Gen., Boston, MA, on brief for appellees Com. of Massachusetts Bureau of Sp. Educ. Appeals, Dept. of Educ. and Dept. of Public Health.

Kevin M. Hensley and Needham and Warren, Boston, MA, on brief for appellee Town of Stow.

Regina Williams Tate and Murphy, Hesse, Toomey and Lehane, Quincy, MA, on brief for appellees Stow School System and Stow School Committee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

PER CURIAM.

This appeal presents a challenge, under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., to the adequacy of an "individualized education program" prepared by the Town of Stow, Massachusetts for a learning-disabled child who lives in the town.[1] The district court ruled that Stow had followed the required procedures in formulating the education program, that the Commonwealth of Massachusetts had given the plaintiffs all the process due them in their administrative challenge to the program's adequacy, and that the program provided a "free appropriate public education" for the child. It therefore granted summary judgment to all defendants. This appeal followed. We affirm.

I

The IDEA requires states that receive federal special education funds to provide all handicapped children in their jurisdictions with a "free appropriate public education." 20 U.S.C. § 1415(a); 20 U.S.C. § 1401(a)(18). This requirement has both procedural and substantive components. *Burlington v. Department of Education,* 736 F.2d 773, 788 (1st Cir.1984) (*"Burlington II"*). "The primary safeguard is the obligatory development of an individualized education program (IEP)." *Roland M. v. Concord School Committee,* 910 F.2d 983, 987 (1st Cir.1990). "An IEP is a program of instruction and related services that has

---

1. The IDEA was once known as the "Education of the Handicapped Act." *See* Section 25(b) of Public Law 102–119, 105 Stat. 607 (substituting "Individuals with Disabilities Education Act" for "Education of the Handicapped Act").

been specially designed to meet the unique needs of the child. The IEP document contains information concerning the child's present levels of performance; a statement of annual goals and short term instructional objectives; a statement of the specific educational services to be provided, and the extent to which this can be done in the regular educational programs; and objective criteria for measuring the student's progress." *Hampton School District v. Dobrowolski*, 976 F.2d 48, 50 (1st Cir.1992).

The IEP is developed by a team that includes a representative of the local educational agency, the child's teacher and parents, and, in appropriate cases, the child himself. 20 U.S.C. § 1401(a)(20). The IEP must be reviewed at least annually and revised when necessary. 20 U.S.C. § 1414(a)(5); 34 C.F.R. § 300.343(d). The parents are entitled to reject a proposed IEP, and if they do, they can demand an "impartial due process hearing" on its adequacy and appropriateness. 20 U.S.C. § 1415(b)(2). In Massachusetts, such hearings are conducted by the Bureau of Special Education Appeals. 603 C.M.R. § 28.-400.0 *et seq.* Any party aggrieved by the decision of the administrative hearing officer can appeal to either state or federal court. 20 U.S.C. § 1415(e).

■ Substantively, the IDEA itself requires courts evaluating an IEP to ask only whether the program is "reasonably calculated to enable the child to receive educational benefits." *Board of Education v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Federal law, however, merely establishes a floor upon which the states are free to build. *See Burlington II*, 736 F.2d at 792. The Massachusetts legislature has gone further than Congress; it defines an appropriate education as one that assures the "maximum possible development" of the child. M.G.L. ch. 71B, § 2.

## II

Christopher Amann, now fourteen years old, lives in Stow, Massachusetts with his parents, Richard and Barbara Amann. In 1983, Christopher enrolled in kindergarten in a Stow public school. It soon appeared that Christopher suffered from learning disabilities. This discovery triggered the Town's obligations under the IDEA, and in November 1983 Stow implemented an IEP for Christopher. Christopher's parents accepted this program, and three subsequent annual revisions, and Christopher attended Stow schools through the third grade.

By September 1987, however, when Christopher entered the fourth grade, his parents had become disenchanted with his educational progress, or lack of it, in the Stow school system. Rather than return him to public school, they enrolled Christopher in Carroll School, a private school in Lincoln, Massachusetts that is devoted to teaching children with learning disabilities. The Amanns say that some representative of the Stow school system recommended sending Christopher to a private school. However, the Amanns never asked for or obtained Stow's formal consent to the transfer, nor did they formally reject the then-current IEP calling for Christopher to attend public school, or request a hearing on its adequacy.

Christopher attended the fourth and fifth grades at Carroll School, at his parents' expense. During this time, neither Stow nor Carroll School reviewed or revised the IEP that the Town had promulgated in December 1986, and that would, in the normal course of events, have come up for examination in December 1987. Stow considered Christopher's enrollment at Carroll School to be a unilateral, private placement that extinguished the Town's obligations under the IDEA, while Carroll School does not create IEPs for privately funded students.

This was the status quo until January 1989, when, in the middle of Christopher's fifth-grade term, the Amanns sent Stow a letter asking it to prepare an IEP for Christopher, and, "during the pendency," to pay for his education at Carroll School.

Stow declined to pay Christopher's Carroll School tuition, but it did respond to the request for an IEP. It evaluated Christopher, convened a "team," and in March

1989 came up with a new IEP. The Amanns neither accepted nor rejected this program. Rather, they postponed their decision until after Christopher had been evaluated, at Stow's expense, at Children's Hospital in Boston. In the meantime, Christopher finished fifth grade and entered sixth grade at Carroll School.

After the evaluation, in late 1989, Stow produced another IEP. Under its terms, Christopher would have returned to Stow and received his language arts and mathematics instruction from a special education teacher who would also have provided him with a daily "academic support class." However, the IEP would have "mainstreamed" Christopher into regular education classes for social studies, science, music, art, and non-academic subjects such as physical education and industrial arts.

The Amanns formally rejected this proposal and asked for a hearing. Stow renewed the rejected IEP in April 1990.

A hearing officer at the Massachusetts Bureau of Special Education Appeals (BSEA) heard four days of testimony in May and June 1990, and compiled a formidable documentary record. The Amanns were represented by counsel. At the end of August 1990 the hearing officer issued his decision. He ruled that Stow had no obligation, either to pay for Christopher's private education or to review or revise his IEP, between September 1987, when the Amanns placed Christopher at Carroll School, and January 1989, when they asked Stow for a new IEP.

The hearing officer also ruled that the IEP Stow had proposed after receiving the Children's Hospital evaluation was "appropriate to address [Christopher's] special education needs so as to assure his maximum possible educational development in the least restrictive educational environment." However, the hearing officer ordered Stow to make two changes to the IEP: 1) to record on the document the services of a "mainstream facilitator" (a teacher designated to monitor and support Christopher's progress in regular education classes), and 2) to make it clear that Christopher would not attend regular industrial arts classes without appropriate support to ensure his safety when using power tools or other dangerous instruments. Because the proposed IEP was otherwise adequate, the hearing officer concluded that Stow was "not financially responsible for [Christopher's continued] Carroll School placement."

In September 1990, Christopher entered the seventh grade at Carroll School. His parents, meanwhile, contested the hearing officer's ruling. Their lawyer filed a motion for reconsideration, claiming that the last proposed IEP was inadequate because it did not provide for a "mainstream facilitator."[2] The hearing officer denied this motion. Mr. Amann then asked for a "compliance hearing" to challenge Stow's implementation of the IEP. The BSEA held a compliance hearing in November 1990, and found that Stow had complied with the hearing officer's decision by making the required modifications to the IEP and thus had "implemented" the program insofar as that was possible given Christopher's continued attendance at Carroll School. Finally, the Amanns asked to reopen the proceedings in order to raise new

**2.** The Amanns' lawyer bowed out after filing the motion for reconsideration. In all subsequent administrative and judicial proceedings, Mr. Amann, acting "pro se," represented himself, his wife and his son. We generally do not allow non-lawyers to represent litigants other than themselves, see *Herrera–Venegas v. Sanchez–Rivera,* 681 F.2d 41, 42 (1st Cir.1982), and the Second Circuit has applied this principle to prohibit a parent who was not a lawyer from representing his child. *Cheung v. Youth Orchestra Foundation of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990). However, because we affirm on the merits, we need not determine whether Christopher and Barbara Amann's appeals are properly

before us. *See Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 8 n. 5 (1st Cir.1991). Similarly, we need not decide whether the notice of appeal, which named only "Christopher Amann et al." in its caption, but was signed by Mr. Amann, adequately identified Mr. Amann as an appellant. *See Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Santos–Martinez v. Soto–Santiago,* 863 F.2d 174, 176 (1st Cir.1988) (court of appeals lacks power to hear appeal from party not specified in notice of appeal, and "et al." does not sufficiently identify an appellant).

charges of lead contamination in the Stow public schools. The BSEA heard argument on this request in December 1990, but refused to reopen the case because it found that the Amanns could, and therefore should, have made the charges earlier.

Even before the BSEA proceedings had concluded, the Amanns went to court. Mr. Amann filed a perfunctory complaint in the United States District Court for the District of Massachusetts in November 1990, but did not immediately serve it on the defendants. In March 1991, Mr. Amann filed a lengthy amended complaint. The amended complaint named Christopher, Richard and Barbara Amann as plaintiffs, and the Town of Stow, the Stow School System, the Stow School Committee, and the Commonwealth of Massachusetts (through the BSEA and the Massachusetts Department of Public Health) as defendants.

The amended complaint contained more than 150 paragraphs organized into six counts. Count One asserted a lead-poisoning claim against the Town of Stow under the Safe Drinking Water Act, 42 U.S.C. § 300j–8(a). Count Two made a claim against the Town under the IDEA, and Count Three asked for legal fees from the Town. Counts Four and Five asserted the liability of the Stow School System and the Stow School Committee under the IDEA. Count Six alleged that the Commonwealth had failed to implement its regulations and ensure compliance with the IDEA. The Amanns asked for both monetary and injunctive relief.

In February 1992 the district court entered judgment for all defendants on all counts. With respect to the Safe Drinking Water Act claim, the court ruled that the Amanns had not provided the notice that is a prerequisite to suit under the statute. 42 U.S.C. § 300j–8(b). With respect to the IDEA claims, the court found 1) that the defendants had satisfied the Act's procedural requirements by giving the Amanns a "fair opportunity to be heard on their claim," and 2) that "the IEP developed by the Stow School System and modified by the BSEA is reasonably calculated to en-

able Christopher Amann to receive educational benefits."

On appeal, the Amanns have attacked both the substantive validity of the IEP, and the Town's and the Commonwealth's procedural compliance with the IDEA; however, they have not challenged the dismissal of their claim under the Safe Drinking Water Act.

### III

The district court ruled that Stow's proposed IEP was substantively adequate because it was "reasonably calculated to enable Christopher ... to receive educational benefits." This was, it appears, a factually unexceptionable proposition, but because it applied the federal "educational benefits" standard created by the IDEA, rather than the more stringent "maximum possible development" benchmark mandated by Massachusetts law, it was legally incorrect. *See Roland M.*, 910 F.2d at 987 (state standards enforceable in federal court insofar as they are not inconsistent with federal rights).

■ However, the BSEA hearing officer measured the IEP against the correct, Massachusetts, standard. Therefore, as long as the record supports the BSEA decision, we can affirm the judgment upholding it. *See Doe v. Anrig*, 728 F.2d 30, 32 (1st Cir.1984) (appeals court is free to affirm on any ground supported by the record).

The Amanns contend that Stow's IEP did not satisfy the Massachusetts requirement that it maximize Christopher's development because Christopher has done, and will continue to do, better academically at Carroll School than in the Stow public schools. If he can do better elsewhere, they reason, then it follows logically that the Stow program does not assure his *maximum* possible achievement.

■ The Amanns have, in essence, repeated an argument made and rejected in *Roland M. v. Concord School Committee.* There, we noted that "purely academic progress—maximizing academic potential— is not the only indicia of educational benefit implicated either by the Act or by state

law." 910 F.2d at 992. Rather, under the IDEA, "[a]n IEP must prescribe a pedagogical format in which, 'to the maximum extent appropriate,' a handicapped student is educated 'with children who are not handicapped.'" *Id.* (quoting 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550(b)(1)). Massachusetts law states the same requirement in different terms; it calls for "maximum possible development in the least restrictive environment." M.G.L. ch. 71B, § 2. Federal and state law, therefore, both dictate a policy of "mainstreaming." "[T]heir common objective is the provision of needed services promptly to learning-handicapped children through the free, local public school system except where the resources of those schools cannot appropriately meet the children's needs." *School Committee of Franklin v. Commissioner of Education,* 17 Mass.App.Ct. 683, 697, 462 N.E.2d 338 (1984).

Parents, of course, are free to make private educational choices solely to maximize their child's academic progress, but the public schools, state agencies and courts charged with administering and enforcing the IDEA do not enjoy the same liberty. "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." *Roland M.,* 910 F.2d at 992–93. "[T]he correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities," *id.* at 993, and in order "[t]o determine a particular child's place on the continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement." *Id.*

In deciding whether Stow's IEP "reasonably calculated" the balance between academic progress and least restrictive environment, the district court had to bear in mind two additional considerations: 1) that the Amanns bore the burden of proving the IEP's inadequacy, *see Burlington II,* 736 F.2d at 794, and (2) that "the alchemy of 'reasonable calculation' necessarily involves choices among educational policies and theories—choices which courts, relatively speaking, are poorly equipped to make." *Roland M.,* 910 F.2d at 992.

On this record, and taking the relevant legal principles into account, we find ample reason to affirm. There was substantial proof from which the BSEA could have rationally concluded that the IEP was adequate and appropriate. *See Roland M.,* 910 F.2d at 994. First, there is no question that Stow's plan envisioned a less restrictive environment for Christopher's education. Its program would have enabled Christopher to spend much of his school day learning alongside non-handicapped children. This opportunity was not available at Carroll School.

Second, even giving full credit to the Amanns' allegation that Christopher enjoyed better academic progress at Carroll School than he would have had he returned to Stow, "there was considerable room for the BSEA, and the district court, to find that the advantages inherent in the IEP did not severely compromise educational benefits." *Id.* The evaluation from Children's Hospital reported that Christopher's "deficits are likely to have their primary impact in domains that depend heavily on output skills," such as writing (but not reading) and mathematics. Stow's IEP would have given Christopher more than ten hours per week of special education in language arts and mathematics.[3] The parties agreed that the special education teacher, Ms. Watskin, was experienced and capable in those areas. Thus, there would seem to be no reasonable dispute about the adequacy and appropriateness of the Stow program with respect to the areas in which Christopher's disabilities were likely to have the greatest effect on his ability to learn and to perform academically.

The Stow program would have "mainstreamed" Christopher into regular classes in science, social studies, music, art, industrial arts, and physical education, but even there, the IEP did not contemplate leaving Christopher entirely to his own devices. As amended in accordance with the hearing

---

**3.** In contrast, the 1986–87 IEP that was in place when the Amanns first enrolled Christopher at Carroll School provided for slightly more than six hours of special education per week.

officer's instructions, the IEP designated Ms. Watskin as Christopher's "mainstream facilitator." Had Christopher returned to public school, Ms. Watskin would have observed his regular classes to track his development and performance, worked with the teachers in those classes to help ensure that he received appropriate attention and instruction, and provided Christopher with an "academic support" class to help him, among other things, prepare for his mainstream classes and work on his needs in those subjects.

"Where the evidence permits two plausible views of adequacy/appropriateness, the agency's choice between them cannot lightly be ignored." *Roland M.*, 910 F.2d at 994. An IEP "may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents *first* choice, or even the *best* choice," *G.D. v. Westmoreland School District*, 930 F.2d 942, 948 (1st Cir.1991) (emphasis in original), yet still provide a free appropriate public education. Our review of the record assures us that the program offered by Stow struck a suitable balance between the goals of mainstreaming and "maximum possible development." We need go no further.

## IV

The Amanns claim that they can identify more than five dozen procedural violations of the IDEA and state or federal regulations, but their appellate brief treats only five such issues in any detail, and we will restrict our discussion to them. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

**4.** Our decision in *Burlington II* is not to the contrary. There, the parents placed their child in a private school, but they also invoked their right to an impartial due process hearing on the adequacy of the Town's IEP. We said "that pending review of an earlier IEP, local educational agencies should continue to review and revise IEPs, in accordance with applicable law." 736 F.2d at 794. The review process may take several years, and "[w]ithout an IEP as a starting point, the court [would be] faced with a

■ First, the Amanns say that Stow ignored its statutory duty to "prepare" an IEP for Christopher between September 1987 and January 1989. Stow had last reviewed Christopher's IEP in December 1986, and the IDEA requires responsible educational agencies to re-examine IEPs at least annually. 20 U.S.C. § 1414(a)(5). However, federal regulations promulgated under the IDEA also say that public officials need "develop[ ] and implement[ ]" an IEP for a child in private school only if the child was "placed in or referred to [the] private school or facility *by a public agency.*" 34 C.F.R. § 300.341(b) (emphasis added).

By December 1987, when the 1986 IEP would have come up for its annual review, Christopher had enrolled at Carroll School. He was not placed there by a public agency; his parents enrolled him unilaterally, without challenging the IEP or obtaining Stow's consent to the transfer. According to regulation, their action relieved the Town of its responsibility to "develop and implement" an IEP for Christopher; and if Stow was not required to *create* an IEP for Christopher, then it follows that the Town had no obligation to review or revise the IEP already in place.[4]

Second, the Amanns accuse the BSEA of denying them due process by refusing to re-open its proceedings to hear their allegations of lead poisoning in the water supply of Stow's public schools. The BSEA refused to convene a hearing to consider the lead-contamination issue because, the hearing officer said:

Any issues bearing on Stow's capacity to implement the BSEA decision concerning the 1990–1991 IEP should have been presented at the compliance hearing. The

mere hypothesis of what the Town would have proposed and effectuated during the subsequent years." *Id.* The pendency of review, not the placement in private school, creates the need to maintain and update the IEP. Because the Amanns did not complain formally about the IEP, or invoke their right to a BSEA hearing concerning its adequacy, there was no administrative or judicial review pending between September 1987 and January 1989, and hence no obligation to review and revise.

parent may not now raise new objections based on evidence that was available to the parties at the time of the prior compliance hearing, but which the parent chose not to present or argue. Conservation of administrative resources, as well as the principles of fairness and finality, demand closure of this matter at this level.

■ The "impartial due process hearings" guaranteed by 20 U.S.C. § 1415(b)(2) "are to be conducted in accordance with state law...." *Burlington II,* 736 F.2d at 781. In Massachusetts, "the granting of a rehearing is discretionary with the agency." *Brookline v. Commissioner of Department of Environmental Quality Engineering,* 387 Mass. 372, 385, 439 N.E.2d 792 (1982). Although the BSEA has not published regulations defining a petitioner's right to re-open an agency proceeding, a notice attached to the hearing officer's initial decision informed the Amanns that motions to re-open would be limited to "newly-discovered evidence, in existence at the time of the hearing, but which could not have been discovered with due diligence."

■ The BSEA did not abuse its discretion in so limiting the Amanns' rights. Other Massachusetts agencies have imposed similar restrictions, *see J.C. Hillary's v. Massachusetts Com. Against Discrimination,* 27 Mass.App.Ct. 204, 536 N.E.2d 1104 (1989), and the Massachusetts statute governing judicial review of agency decisions says that a court should reopen a matter to hear additional evidence only if it finds "good reason" for the failure to offer it earlier. M.G.L. ch. 30A, § 14(6).

Nor did the BSEA abuse its discretion by denying the specific request at issue here. The affidavits that Mr. Amann submitted to the district court showed that he knew of the alleged lead problem no later than the "Spring of 1990." If this knowledge came too late to bring the issue up at the initial hearing in May and June, it certainly came in time to raise the alleged contamination in the context of either the motion to reconsider or the compliance hearing.

The Amanns' three other procedural contentions share a basic flaw. We have said that courts "must strictly scrutinize IEPs to ensure their procedural integrity. Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective. Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Roland M.,* 910 F.2d at 994.

■ None of the remaining alleged procedural lapses had such a significant consequence. Stow may have violated a Massachusetts regulation by "unilaterally" modifying the IEP to conform to the hearing officer's instructions, rather than convening the full "team" (including the parents) to perform the task. *See* 28 C.M.R. § 28.-404.5 ("The TEAM which completed the school evaluation shall write the IEP incorporating the decision of the hearing officer"). But any error was harmless, as the hearing officer found, because in making the modifications—which recorded the services of a "mainstream facilitator" and the restriction on Christopher's use of power tools in shop classes—Stow merely "fulfilled a ministerial function and rendered no independent judgment...." Had the full team met, it "would have had no discretion to expand, amplify or alter the IEP" beyond the terms set by the hearing officer. The Amanns' absence, in other words, did not "seriously hamper" their ability to participate meaningfully in the formulation process.

■ Similarly, the BSEA committed at worst a harmless error by failing to give the Amanns a transcript of a hearing held on December 7, 1990, at which the BSEA heard the Amanns' request to re-open the proceedings. The hearing was recorded but the BSEA apparently lost the tape. The lack of a transcript may have violated the IDEA, *see* 20 U.S.C. § 1415(d)(3) (party to agency hearing has "right to a written

or electronic verbatim record of such hearing"), but, because the hearing officer spelled out in writing her reasons for denying the request to re-open, and because we have found that she was within her discretion to make the denial, the BSEA's procedural negligence caused no substantive injury.

 Finally, the Amanns complain that the BSEA rendered an untimely decision. A federal regulation, 34 C.F.R. § 300.-512(a)(1), requires agencies like the BSEA to reach a final decision with respect to the "impartial due process hearing" within 45 days after it has received a request for such a hearing. The BSEA indisputably missed this deadline. The Amanns requested the initial hearing on February 8, 1990, and the hearing officer did not issue his decision until August 31, 1990, 204 days after the request was made.

The Amanns say that the BSEA's tardiness in issuing a decision caused them prejudice because the decision, dated August 31, 1990, "was not delivered to the parents until they had already paid the tuition and started Christopher in Carroll for the term...." The implication is that the Amanns might have complied with the BSEA decision and enrolled Christopher in Stow for the 1990–91 school year, saving themselves the tuition, if only the BSEA had made a decision before the school year started.

However, the record gives us no reason to believe that the Amanns would have responded to a timely adverse decision by sending Christopher back to Stow. They submitted no evidence to that effect, and their appellate brief indicates that Christopher remained in private school not only in 1990–91, but for the 1991–92 school year as well. If the Amanns enrolled Christopher in a private school in September 1991, a year after they learned that the BSEA had confirmed the adequacy of Stow's IEP, then we can only infer that they would not have returned him to public school in 1990, regardless of the outcome of the BSEA hearing. And if the hearing officer's late decision had no effect on their choice of schools for the 1990–91 school term, then it caused no remediable harm.

*Affirmed.*