**Eduardo ORTIZ, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 91–2216CCC.**

United States District Court,
D. Puerto Rico.

May 9, 1995.

---

**364**

Winston Vidal–Gámbaro, Hato Rey, PR, for plaintiff.

Guillermo Gil, U.S. Atty., Washington, DC and María Hortensia Ríos–Gándara, Asst. U.S. Atty., Hato Rey, PR, for defendant.

## ORDER

CEREZO, Chief Judge.

This action, filed pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, arises from injuries suffered by Eduardo Ortiz on August 23, 1987 when a military ordnance device handed to him by one of his sons exploded in his hand. The accident occurred in restricted waters off the north coast of Piñeros Island, adjacent to and part of the restricted area of the Roosevelt Roads Navy Base at Ceiba, Puerto Rico. The plaintiffs had arrived there in their pleasure boat, accompanied by three other families who had their own boats.

A bench trial was held on April 21–23, 1993. The defendant submitted its post-trial brief on September 26, 1994; plaintiffs' brief followed on October 25, 1994.[1]

The uncontroverted facts of the incident are as follows:

Piñeros Island, approximately one-half square mile in size, is used for military training exercises. Retired Master Chief Thomas Keith, formerly attached to Naval Special Warfare Unit (Navy SEALS), prior to his retirement in late 1992 after 31 years of service, had himself conducted some 50 to 60 classes there dealing with unconventional warfare tactics and techniques, and the use of explosives and devices. An expert on the military training sessions conducted on the Island, he stated that the sessions would take place, primarily at night, for a week at a time between six to nine times a year. When the session ended, the entire class would make sweeps through the areas they had been using to pick up expended ordnance or any ordnance inadvertently left behind. He explained that training sessions are held on the Island, and not elsewhere on the base, specifically because it is an unpopulated Island. The ordnance, explosives, and explosive devices cannot be used in populated areas.

On the day of the accident, the Ortiz–Méndez family anchored their boat about 40 feet from the shore of the Island. After eating lunch, Eduardo Ortiz, two of his sons Arturo and Javier, ages 13 and 17 years old respectively, and his friend Luis Quiñones were in the water. The younger boy found an olive green-colored object, shaped like a soda pop can with a tape and hook-like part attached and approached his father with the object. Believing that the object might be dangerous, Ortiz moved to meet his son and took it away from him. Shortly thereafter, it exploded in his left hand, seriously maiming and burning the hand and causing burns on his chest.

Ortiz was taken to Marina Puerto Chico in Edgardo Colón's vessel. Javier Ortiz–Méndez accompanied them. From there they went to Fajardo Hospital where Ortiz was

---

1. Submission of the briefs was delayed by the decision to request trial transcripts for use in their preparation.

given a tetanus shot, antibiotics and an injection for pain. His hand was bandaged and he was then referred for treatment to the Medical Center in Río Piedras. He was hospitalized and treated there for a month.

Although Ortiz testified that he did not see any warning signs in the area of Piñeros where he and his friends were anchored, he stated that he did see various patrol boats in the area on that day, and on prior occasions, but the boats were far away and no one shouted or signaled to them to leave the area. His son Arturo, however, did testify that they were not allowed on the Island, from which we infer that plaintiffs did have general knowledge of the possible dangers there. Moreover, Edgardo Colón, one of his friends who accompanied them on his own boat, testified that Piñeros was a restricted area because of military exercises and that they could not go ashore.

The object described by the plaintiffs was identified by Thomas Keith as a hand grenade simulator. He described the simulator as containing a low explosive, causing less risk of injury than the high explosive grenade. The simulator contains photo-flash powder and is ignited by a fusing system that includes a string pull with a toggle on it. Keith testified that the cylindrical simulator is made of cardboard material and at each end there is a wax fitting that is pressed into the cardboard itself making it airtight. The trainees ordinarily sprayed painted them green or black to conceal the white color; others would simply wrap olive green tape around the device to conceal the color at night. The tape could be used to substitute for the safety clip to secure the string so that the string is not pulled by accident. The simulator ignites in four to six seconds, depending on how tightly the powder is packed.

The witness distinguished this device from other types of simulators. He described the injuries he has seen caused by grenade simulators, first and second degree burns, but stated that he had never seen an injury in which the person was holding the device in his hand when it exploded.

Keith stated categorically that if either the black powder used for the fuse, or the photo-flash powder itself gets wet, or even damp, it will not detonate. He further stated that if the device fell in the water it would simply float ashore because there is an air pocket well sealed into the device. He also indicated that it would take weeks for the simulator to become so saturated that it would actually sink, and once it sank the device would not work because neither of the substances would burn. He concluded that it was found on land because it functioned in Ortiz's hand and it would have had to be dry to do so.

Plaintiffs presented no evidence to controvert the government's evidence regarding ignition of the powders or the material out of which the cylinder was made. Although Arturo Ortiz–Méndez testified that he found the object in a pile of things on the bottom under the water, we give no credibility to that statement, and find that the cylinder was picked up floating near the shore or on the Island.

Ortiz and his son Javier denied speaking to any officers at the hospital. Having evaluated the demeanor and credibility of the witness, however, we give credit to the testimony of Pedro Roldán, a police officer with the Fajardo maritime unit, who stated that he went to the Fajardo District Hospital where he spoke with both Ortiz and Javier who told him that his father had removed a tape from the object immediately before it exploded.

With regard to the presence of signs warning about the danger of explosives in the area and the patrolling of the adjacent waters by the maritime police and Navy, we find that the presence or absence of signs is not significant in light of the testimony from both parties that pleasure boats were allowed to anchor off the shore of the Island. Moreover, this was supported by the government's own witnesses. Keith further testified that the signs which he first placed in 1977 were erected only on the beaches accessible to civilian boats. Pleasure boats would usually anchor on the western and northern part of the Island because it was more attractive and they could pull very close to the shore.

Keith testified that civilians are not allowed on this Island; it is designated as restricted because it has unexploded devices. He acknowledged, however, that he himself

has encountered civilians on Piñeros several times—mostly fisherman setting traps at night or coming ashore to have lunch. They would be advised that they had to leave and if they refused, he would call the base to have a patrol boat sent over there. That the Navy has been inconsistent in enforcing the restriction regarding Piñeros Island was further evidenced in the testimony of Donald Lloyd Bean, Commander in the Navy, SEAL by profession, 25 years in the military service, and currently stationed at Roosevelt Roads. Bean stated:

> Civilians are not allowed on Piñeros Island. Recently there has been, in the interest of good neighbors, the bases try to work out an agreement or be a little more flexible in allowing civilians to come closer into Piñeros Island at any time. But they can bring their boats, I believe they can bring their boats....
>
> I believe that recently they have been allowed to bring their boats in a little bit closer to the Island. And I don't know exactly what the policy on that is. So I don't want to elaborate. But, no, they are not allowed on the Island.

The law of the state where the tort occurred is the applicable under the Federal Tort Claims Act. 28 U.S.C. § 2674 ("The United States shall be liable ... In the same manner and to the same extent, as a private individual under like circumstances....") *See also Mas v. United States,* 984 F.2d 527, 528 (1st Cir.1993); *Town of Burlington v. Department of Education,* 736 F.2d 773, 785 (1st Cir.1984). The applicable Puerto Rico law may be found in 31 LPRA § 5141:

> A person who by an act or omission causes damage to another .fault or negligence shall be obliged to repair the damage so done. *Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity, but entails a reduction of the indemnity.*

(Emphasis added.) The Navy was clearly negligent in allowing civilian boaters into restricted waters and maintaining an unclear enforcement policy. Having knowledge that fishermen had entered the Island to lay traps or eat lunch, they knew that Piñeros itself was being trespassed upon, notwithstanding the signs, patrols, and warning on nautical charts. Thus, it was clearly foreseeable that a civilian could easily encounter an unexploded device. Moreover, from the government witnesses' detailed testimony regarding the frequency and nature of the military exercises held on Piñeros, as well as the quantities and varieties of ordnance and explosives used there, defendant's heightened knowledge of the seriousness of accidental injuries create a greater awareness of the danger than recreational boaters' general knowledge that the area is restricted because of military training exercises held there.

Based upon the facts as we find them, however, the doctrine of concurrent negligence is applicable in this case. Although the plaintiffs knew that they were not allowed on the Island, they nonetheless chose to anchor close enough so as to enable Arturo to swim or wade to shore.[2] We therefore find that Ortiz was negligent by anchoring in a place where his young son would be tempted to go to or get too close to the beach, and assign thirty (30) percent of the responsibility for the damages to him.

### INJURIES AND DAMAGES SUFFERED

About an hour and a half to two hours elapsed from the time of the injury until Ortiz reached the hospital in Fajardo. The injured hand was bleeding during that time. Palliative treatment was given and Ortiz was sent on to the Medical Center in San Juan. He had burns and four or five deep wounds in the palm of his left hand and between the fingers; his fourth finger was hanging by a thread of skin and his fifth finger was badly crushed. The hand was severely swollen. He had burns on his chest as well. The fourth finger had to be amputated. He was hospitalized for about a month. The medical experts, Drs. Julio Simmons and Cándido Martínez quantified Ortiz's bodily impairment as 20% and 15%, respectively, due to loss of function in his left hand. He was

---

**2.** During his testimony Ortiz mentioned the fact that he was *standing* in the water about three or four feet deep. He also stated that his son was *walking with the device.* Arturo testified that where the object exploded the water must have been four or five feet deep.

unable to work for about a year, during which time he had to sell his boat, and take food coupons to help provide for his family. He felt very depressed, and as if he were handicapped and he was embarrassed about explaining his injury to others. His relationship with his wife and children became difficult. The emotional problems, however, were not of such a magnitude as to require the intervention of a mental health professional. Ortiz presented evidence of in medical expenses of $400.00.

Before the accident, Ortiz had his own business as an auto mechanic which, according to income tax returns in evidence, generated a net gross income of approximately $3,500. per year. Although his own business did not survive, the plaintiff was able to more than mitigate his continued loss of income: His employment as a mechanic with the National Guard provides a gross income of about $17,000 per year, or an approximately sixty percent increase over what he had made when self-employed. Both parties' medical experts considered Ortiz as having made excellent a rehabilitation.

His wife, Mayra Méndez, stated that at the moment of the accident she was inside the boat with their middle son, Daniel, who was ill. She testified that when she came up and saw what had happened, she was so upset that she jumped over the side of the boat into the water to help her husband, even though she doesn't know how to swim. Méndez, who had been a homemaker, had to go out to work for about a year, during the period when her husband was unable to do so. Méndez related her own emotional reactions to the events, the strain and tension that it caused to the family and marital relationship. She sought counseling from her priest. Méndez further stated that while the situation has improved, it is still not the way it was before the accident, because her husband has a complex about his hand.

Arturo Ortiz–Méndez' own physical injuries were minimal; he testified that the nurse who later checked him at the hospital removed some small things and put some iodine on them. He spoke about his own

shock over what had happened and stated that after the accident he missed some days of school and failed tests. Arturo testified that as a result of his feelings about his role in his father's injuries, he felt badly; he would wake up at night thinking about the accident and go crying to his mother. His relationship with the family was difficult, he spoke less to his friends, and didn't want to go out. His mother took Arturo to the family physician who told him that it had been an accident, it was not his fault and to forget the whole thing. Arturo did not seek any counseling with the school social worker nor did he require any treatment by a mental health professional. He stated that little by little, with the support of his friends and family, he overcame the situation.

Javier and Daniel Ortiz–Méndez also testified about the strained family relationships after the accident and their own emotional feelings resulting from the experience. The three Ortiz–Méndez brothers impressed the court as having fully recovered from any adverse effects that the events may have had on them.

Having carefully considered the facts as delineated above, we find that Eduardo Ortiz' damages are valued as follows: **Physical injuries, loss of function, disfigurement—$100,000, Pain and Suffering—$70,000, Medical Expenses—$400, and Loss of Income (as representative of the conjugal partnership)—$4,000,[3] for a total of $174,-400. Because 30% of the responsibility rests with Ortiz himself, the United States is liable to him for the amount of $122,200.**

The United States is also liable for emotional damages to the other plaintiffs as follows: **Mayra Méndez—$20,000; Javier Ortiz–Méndez—$5,000; Daniel Ortiz–Méndez—$5,000; and Arturo Ortiz–Méndez—$10,000.**

Judgment shall be entered accordingly.

SO ORDERED.

---

**3.** As reported on his income tax forms, Ortiz's adjusted gross income for 1986 was $3,243.28; for 1985, $3,955.33. The plaintiff testified that he was out of work for one year. A copy of his 1991 tax return reports a salary of $19,332.99.