**DEKALB COUNTY SCHOOL DISTRICT, Plaintiff,**

v.

**M.T.V., by and through his parents and next friends, C.E.V. and C.T.V., Defendants.**

**No. Civ.A. 103CV956CAP.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 19, 2005.

---

Charles L. Weatherly, Sr., Thomas W. Dickson, Wendy J. Armstrong, The Weatherly Law Firm, Atlanta, GA, for Plaintiff.

Chris E. Vance, Office of Chris E. Vance, Atlanta, GA, for Defendants.

## ORDER

PANNELL, District Judge.

This matter is now before the court on the plaintiff's motion for judgment on the administrative record [Doc. No. 36], the defendants' motion for clarification [Doc. No. 37], and the defendants' motion for partial summary judgment [Doc. No. 38]. The court has reviewed the entire administrative record [Doc. No. 3] and has carefully examined the parties' submissions. For the reasons that follow, the court will uphold the decision of the Administrative Law Judge ("ALJ").

### Factual Background

In this action, the DeKalb County School District ("School District") seeks review of a decision issued by an ALJ pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). In that decision, the ALJ found that vision therapy was a necessary service in order for M.T.V., a disabled child, to receive a free appropriate public education ("FAPE") as required by the IDEA. The ALJ therefore ordered the School District to reimburse M.T.V.'s parents in the amount of $2,230.00 for the cost of vision therapy[1] services they provided M.T.V. during the 2001–2002 school year.

### Legal Analysis

#### I. Requirements of the IDEA

The IDEA provides federal funding to assist state and local agencies in educating children with disabilities, and it conditions such funding upon a state's compliance with extensive goals and procedures set forth in the statute. 20 U.S.C. § 1400 *et seq.; Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). The primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A).

In order to effectuate this goal, the IDEA requires that state and local education agencies conduct an evaluation process to identify children with disabilities and to develop an annual individualized education program, or IEP, for each disabled child. *Id.* § 1414; *Walker County School District v. Bennett*, 203 F.3d 1293, 1294 (11th Cir.2000). The IEP is developed by an IEP Team, which consists of the parents of the child with a disability, at least one regular education teacher of the child (if the child is or may be participating in the regular education environment), at least one special education teacher or provider of the child, a representative of the local educational agency, and any other individuals with knowledge or special expertise regarding the child. 20 U.S.C. §§ 1414(c), 1414(d)(1)(B).

Each child's IEP must contain a written statement indicating (1) the child's present levels of educational performance; (2) measurable annual goals related to meeting the child's needs that result from his disability to enable him to be involved in and progress in the general curriculum, as well as meeting the child's other educational needs that result from his disability; (3) the special education and related services and supplementary aids and services to be provided to the child; (4) the extent, if any, to which the child will not participate with non-disabled children in the regular class and in other activities; (5) any indi-

---

1. The ALJ denied the parents' claims for reimbursement for lost wages and transportation costs.

vidual modifications in the administration of assessments of student achievement that are needed; (6) the projected date for the beginning of services and modifications, and their anticipated frequency, location and duration; and (7) how the child's progress toward the annual goals will be measured and how the child's parents will regularly be informed of their child's progress. *Id.* § 1414(d)(1)(A). In turn, the general requirement of a FAPE, is defined in the statute as "special education and related services" that (1) have been provided at public expense, under public supervision and direction, and without charge; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education in the state involved; and (4) are provided in conformity with the child's IEP. *Id.* § 1401(8).

## II. Standard of Review

If the parents of a disabled child are dissatisfied with their child's IEP, the state or local agency is required to afford them an impartial due process hearing. *Id.* § 1415(f)(1). Any party aggrieved by the findings and decision made in that administrative proceeding has the right to bring a civil action in district court. *Id.* § 1415(i)(2)(A). In that lawsuit "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

■ The Supreme Court has delineated the following guideline for review:

[A] court's inquiry in suits brought under 20 U.S.C. § 1415(e)(2) is two-fold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these two requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051; *Doe v. Alabama State Department of Education*, 915 F.2d 651, 655 (11th Cir. 1990).

■ Reviewing courts must give "due weight" to the record of the administrative proceeding. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. In *Rowley*, the Supreme Court made it clear that § 1415(e)(2) is not an invitation to the district court to substitute its own judgment on sound educational policy for those made at the state administrative level. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050. The Eleventh Circuit has recognized that the role of the district court is simply to "review the administrative determinations contemplated by the Act." *Manecke v. School Board*, 762 F.2d 912, 919 (11th Cir.1985).

■ The extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court. *Jefferson County Board of Education v. Breen*, 853 F.2d 853, 857 (11th Cir.1988). The court must consider the administrative findings of fact but is free to accept or reject them. *Id.* (citing *Town of Burlington v. Department of Education, Commonwealth of Mass.*, 736 F.2d 773, 792 (1st Cir.1984)).

■ As an initial procedural matter, the court notes that "summary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." *Loren F. ex rel. Fisher v. Atlanta Independent School System*, 349 F.3d 1309, 1313 (11th Cir.2003) (quoting *Beth B. v. Van Clay*, 282 F.3d 493, 496 n. 2 (7th

Cir.2002)). Thus, the district court's decision "is perhaps better described as judgment on the record." *Id.; see also Slama v. Independent School District No. 2580,* 259 F.Supp.2d 880, 882 (D.Minn.2003) (on motion for judgment on the record in an IDEA suit, the district court "may make a decision on the merits, even if there exist, upon the stipulated record, disputed issues of material fact"). Accordingly, the usual Rule 56 summary judgment principles do not apply in an IDEA case. As such, this court will construe the defendants' motion for partial summary judgment [Doc. No. 38] as a motion for judgment on the record.

### III. ALJ's Decision

#### A. Findings of Fact

Having conducted two hearings, which included the admission of extensive documentary evidence, and reviewed the briefings by the parties, the ALJ rendered a Final Decision [Doc. No. 1, Ex. B]. The Final Decision contained a lengthy findings of fact section. This court has summarized the ALJ's findings of fact below.

On August 9, 2001, the defendant convened an IEP meeting to review M.T.V.'s current level of performance and write an IEP for the coming school year. Despite the fact that Dr. Sharon Berger, a behavioral optometrist, had recommended vision therapy for M.T.V., his parents did not request that the School District provide vision therapy because the parents did not consider this therapy an educational necessity at that time.

Another IEP meeting was convened on September 13, 2001, to review M.T.V.'s progress. No member of the team, including M.T.V.'s parents, raised concerns regarding his vision during this meeting.

In September or October 2001, M.T.V. began complaining to his parents about difficulties reading printed material. Specifically, M.T.V. complained that words would become fuzzy or three-dimensional and that words would move around the page. M.T.V. stopped bringing books home from school, and when his mother tried to get him to read, he became upset and refused to read the books. M.T.V.'s mother first informed the defendant of the need for vision therapy in an October 2001 memorandum to Sandra Foxworth a special education consultant employed by the School District.

Another IEP meeting was convened on November 2, 2001, during which a staff member from M.T.V.'s school reported that M.T.V. described words as looking three-dimensional. All teachers and staff members indicated, however, that M.T.V. was continuing to make progress on his IEP goals and did not demonstrate difficulty understanding or mastering the curriculum. The IEP Team reviewed a memo by Dr. Berger and a checklist of symptoms prepared by M.T.V.'s mother. The Team agreed to refer M.T.V. to Dr. Robert Spencer for an evaluation.

Prior to the evaluation by Dr. Spencer, M.T.V. was seen by Dr. Daniel Gottlieb, a behavioral optometrist. Dr. Gottlieb found that M.T.V. had accommodative and convergence disorder and was unable to sustain single vision while reading. Dr. Gottlieb recommended forty-eight sessions of visual therapy, which he felt was "medically necessary in order to reduce the visual loss and increase the visual and motor efficiencies." *See* Gottlieb Letter [Doc. No. 3 at R–401].

After examining M.T.V. upon referral from the defendant, Dr. Spector stated that, although M.T.V. had convergence insufficiency, he would not recommend any vision therapy because he found M.T.V.'s ocular tracking to be normal and he found no evidence of pathological nystagmus.

On December 14, 2001, another IEP meeting was held to discuss whether

M.T.V.'s educational needs included vision therapy. After discussing the evaluations of Dr. Spector, Dr. Gottlieb, and Dr. Berger, the team concluded that M.T.V. did not require vision therapy in order to receive a FAPE and did not add vision therapy as a necessary related service on M.T.V's IEP.

In December 2001, M.T.V. began vision therapy with Sharyn Freant at Gottlieb Vision Group. M.T.V. attended therapy once a week for one hour and was given home exercises to perform. M.T.V.'s parents expended a total of $2,230 for the therapy sessions and related materials. Additionally, M.T.V.'s parents had to take time off work and had to drive a total of 270 miles to provide M.T.V. with transportation to and from his appointments. The therapy sessions were terminated in March 2002 when M.T.V. reported that words no longer moved around the page and no longer appeared blurry.

If M.T.V. had not received therapy when he did, his vision problems would have increased. Untreated, the double vision experienced by M.T.V. would have become worse. M.T.V. would likely have begun to read less because of the increasing severity of the headaches caused by reading. Because he received therapy, M.T.V. was able to develop clear single vision and no longer suffered from accommodative and convergence problems. He was able to see well both near and far, and to track and fixate well.

## B. Conclusions of Law

In his Final Decision [Doc. No. 1, Ex. B], the ALJ set forth various conclusions of law. This court has summarized the ALJ's relevant conclusions of law below.

▮ The School District had the burden of establishing the proposed IEP for M.T.V. was appropriate and provided a FAPE. Both sides presented substantial evidence supporting their relevant conten-

tions. The medical and expert witness evidence, as well as the credible testimony of M.T.V.'s father, established by a preponderance of the evidence that M.T.V. had developed significant visual problems by the fall of 2001. The evidence also demonstrated that, without the vision therapy he received from Ms. Freant and at home during the school year, M.T.V.'s vision problems would have become much worse and eventually interfered significantly with his ability to benefit from special education. Therefore, vision therapy was a necessary related service, and the School District had an obligation to provide this service to M.T.V.

Transportation costs were not recoverable because there was no evidence presented at the administrative hearing to support an award for reimbursement of transportation costs. Lost wages were likewise not recoverable because testimony presented by M.T.V.'s father established that he lost no wages as a result of transporting his son to therapy sessions. Furthermore, there was no evidence presented to establish that M.T.V.'s mother lost wages as a result of transporting her son to therapy sessions.

## IV. Cross Motions for Judgment

In its motion for judgment, the School District contends that the ALJ erred in ascribing Ms. Freant expertise that she did not possess and in permitting her to render a medical diagnosis where she had no training or licensure. According to the School District, the ALJ's determination that M.T.V.'s visual problems would worsen and eventually interfere with his ability to benefit from special education was based solely upon Ms. Freant's testimony.

Having reviewed the administrative record and the Final Decision of the ALJ, this court finds that the School District misconstrues the ALJ's words. The ALJ stated

that "medical and expert witness evidence as well as the credible testimony of the father established by a preponderance of the evidence that M.T.V. had developed significant visual problems by the fall of 2001, and that without the vision therapy he received from Ms. Freant and at home during the school year, M.T.V.'s visual problems would have become much worse and eventually interfered significantly with his ability to benefit from special education." Final Decision at 12 [Doc. No. 1, Ex. B]. While he goes on to state that he found Ms. Freant's testimony particularly persuasive, the ALJ had additional evidence upon which he could rely to reach the above determination.

First, the medical evidence before the ALJ included a report from Dr. Berger who indicated that M.T.V. showed difficulty with eye team and focusing and that vision therapy was recommended. *See* Berger Report [Doc. No. 3 at R–333]. Second, there is a report from Dr. Gottlieb, establishing that M.T.V. was unable to sustain single vision while reading and recommending vision therapy in order to reduce vision loss and increase visual and motor efficiencies. *See* Gottlieb Letter [Doc. No. 3 at R–401]. Dr. Gottlieb further opined that if left untreated, M.T.V.'s "visual disorders will in time negatively affect his abilities to succeed in academic challenges." *See id.* Third, there was a report from Dr. Linda Dagi who stated that vision therapy would be worth a try to help M.T.V.'s tracking dysfunction. *See* Dagi Letter [Doc. No. 3 at R–1592]. And finally, even the doctor who evaluated M.T.V. upon the request of the School District conceded that the M.T.V.'s visual problems made the task of reading more difficult. *See* Specter Letter [Doc. No. 3 at R–420]. Thus, the School District's claim that the ALJ relied solely on the lay testimony of Ms. Freant in reaching his determination is without merit. The evidence before the ALJ supports his determination that M.T.V. had significant vision problems that if not treated would impede his ability to benefit from his IEP.

The School District next contends that the ALJ erred in determining that M.T.V. was denied a FAPE. According to the School District, the ALJ based this determination upon the mere possibility that M.T.V. would develop vision problems at some point in the future rather than on any difficulties that M.T.V. was having in school. The School District repeatedly reiterates the facts that M.T.V.'s grades remained excellent and that he continued to make progress toward the goals set forth in his IEP. The court is astounded that the School District would take such a position. The overwhelming evidence demonstrates that M.T.V.'s visual problems affected his ability to read and decreased his participation in the school's reading program. The fact that these issues had not yet negatively affected M.T.V.'s grades and academic progress simply does not equate to the School District's conclusion that there was merely a possibility that M.T.V. would experience problems in the future.

In addition to Ms. Freant's testimony establishing that a person experiencing the vision problems of M.T.V. would have double and blurred vision when attempting to focus on a task such as reading, *see* Hearing Transcript Vol. I at 55–58 [Doc. No. 3], the administrative record contains evidence that M.T.V.'s vision problems were preventing him from benefitting from his special education. First, it is undisputed that in the fall of 2001, M.T.V. complained to his parents about difficulties he experienced when trying to read, such as printed material becoming fuzzy or three dimensional and words moving around on the page, resulting in M.T.V.'s avoidance of reading. *See* Hearing Transcript Vol. II at 270—273 [Doc. No. 3]. Additionally, one of M.T.V.'s teachers testified that M.T.V.

had difficulty copying from the board. *Id.* at 205. Another teacher, M.T.V.'s special education reading teacher, noted that while she was working with M.T.V., he informed her that a word on the page from which he was reading "went 3D." *Id.* at 120. And finally, M.T.V. stopped participating in the school reading program at home because he refused to read. *Id.* at 313–14. This evidence supports the ALJ's conclusion regarding the necessity for vision therapy to allow M.T.V. to receive a FAPE. As such, the School District's argument that the ALJ erred is without merit.

Turning to the defendants' motion for partial summary judgment, the court is asked to uphold the ALJ's award of reimbursement costs and to additionally award reimbursement for transportation costs and lost wages. As set forth above, the court has concluded that the ALJ's Final Decision regarding reimbursement for the costs of vision therapy is supported by the evidence from the administrative record. Thus, the only issues remaining to be resolved in the defendants' motion are the claims for reimbursement of transportation costs and lost wages.

 The ALJ found that there was no evidence before him to allow a calculation of transportation costs. Final Decision at 13 [Doc. No. 1, Ex. B]. Further, the ALJ found that there were no lost wages because M.T.V.'s father testified that he was a salaried employee and lost no wages as a result of transporting M.T.V. to therapy sessions. Furthermore, there was no evidence presented to the ALJ regarding the mother's loss of earnings. In the instant motion, the defendants offer no argument on why these conclusions of the ALJ were incorrect. Nor do the defendants set forth additional evidence to support these claims. Accordingly, this court upholds

the ALJ's decision to deny reimbursement transportation costs and lost wages.

### Conclusion

For the foregoing reasons, the court hereby:

(1) DENIES the plaintiff's motion for judgment on the administrative record [Doc. No. 36];

(2) GRANTS the defendants' motion for clarification or alternatively a continuance [2] [Doc. No. 37]; and

(3) GRANTS the defendants' motion for judgment [Doc. No. 38].

This order resolves all pending issues in this action. Therefore, the clerk is DIRECTED to close this file.

SO ORDERED.

---

**2.** The January 3, 2005, response pleading is accepted as filed and was considered by this

